IOWA HOTEL ASSOCIATION, a corporation, et al., appellants, v. STATE BOARD OF REGENTS (members), et al., appellees.

No. 50593.

April 3, 1962.

Gibson, Stewart & Garrett, of Des Moines, for appellants.

Evan Hultman, Attorney General, Arthur O. Leff, of Iowa City, and Herschel G. Langdon, of Des Moines, Special Counsel, for appellees.

SNELL, J.—This is an action in equity to enjoin the State Board of Regents from proceeding with the construction and financing of additions to the Iowa Memorial Union at the State University of Iowa under the provisions of chapter 185, Laws of the Fifty-eighth General Assembly. Plaintiffs allege that the law violates the Constitution of the state of Iowa and that the proposed facilities are not authorized or within the power of the Board of Regents or the state of Iowa.

Chapter 262 of the Code, as amended, provides for a State Board of Regents to govern the State University of Iowa, Iowa State University of Science and Technology, State College of Iowa and other institutions of learning and service to the people.

Chapter 185, Laws of the Fifty-eighth General Assembly, entitled "Self-Liquidating College Buildings", authorizes the State Board of Regents to set aside and use such portions of the respective campuses of the institutions of higher education under its control as the board shall determine to be suitable for the construction thereon of self-liquidating and revenue producing buildings and facilities, which the board deems necessary for the comfort, convenience and welfare of students and suitable for the purposes for which the institutions were established, "including student unions, recreational buildings, auditoriums * * * and additions to or alterations of existing buildings or structures now or hereafter used for any or all of the purposes aforesaid." The law declares the erection of such buildings, improvements and facilities for educational institutions of higher learning to be a public necessity. The title to all real estate so acquired and improvements erected thereon shall be in the name of the state.

Under this law the Board of Regents is authorized to charge and collect from all students in attendance, or from any specified class or part thereof for which facilities are deemed necessary, fees and charges for the use and availability of such buildings and facilities and for the services and benefits made available therefrom. The fees and charges shall be applied to the costs of acquisition, construction, maintenance and financing of the improvements.

In carrying out the powers the board is authorized to borrow money on the credit of the income and revenues to be derived from the operation or use of the facilities and from fees or charges made by the board to students for whom such facilities are made available and to issue notes, bonds or other evidence of indebtedness in anticipation of the collection of such income, revenues, fees and charges, and pledge the same for the discharge of the indebtedness.

The law specifically provides that no obligation created thereunder shall ever be or become a charge against the state of Iowa.

The last section of the law provides: "All such self-liquidating projects under this Act shall be first approved by the budget and financial control committee."

The Iowa Memorial Union on the campus at the State University of Iowa in Iowa City is composed of what is known in the record as units I, II and III. These units were constructed, built and paid for by the Iowa Memorial Union Corporation, a private corporation, and thereafter were conveyed to the state of Iowa for the use and benefit of the state university. These units were completed in 1926, 1927 and 1955 respectively. The Board of Regents now proposes, under the authority of chapter 185, Laws of the Fifty-eighth General Assembly, the construction of additions known as units IV, V and VI. Unit IV, as proposed, will be a ground floor and first-floor addition. Unit V will be constructed above and on unit IV and will consist of three additional floors. Unit VI will be constructed above and on the present unit III. The units will be connected by halls. There will be elevator service (self-service) to the upper floors.

The proposed construction has been under consideration by the university authorities and the Board of Regents for several years. The Board of Regents in December 1959 approved the proposed project and asked approval by the budget and financial control committee of the legislature.

Negotiations for the financing of the improvements led to a commitment from institutional lenders to finance the cost not exceeding $4,500,000. The indebtedness so incurred was to be evidenced by notes issued by the Board of Regents maturing July 1, 1992, bearing interest at the rate of five per cent per annum payable semiannually. There will be 50 level semiannual payments of principal and interest. As security for the loan the Board of Regents and the Iowa Memorial Union are to pledge allocated student fees, together with net revenues from Iowa Memorial Union activities, for the payment of the notes. The Board of Regents covenants to charge, collect and allocate to the payment of the notes University of Iowa student fees in an amount which, together with other net revenues of the Memorial Union, will be sufficient to pay the principal and interest in accordance with the mandatory amortization schedule. Under this plan the Board of Regents, through the university, will assess student fees in the amount of $8.50 per student per semester or $17 per academic year and $4.00 per summer quarter attended. Approximately 75% of the total cost for the debt

retirement will be met by these student fees and approximately 25% from the operating income of the Memorial Union. The percentages of income derived from various sources are esti- mates and vary slightly but are sufficiently accurate for the purposes of this case.

The budget and financial control committee of the Fifty-eighth General Assembly approved the project on January 6, 1960.

Proposed unit IV is essentially a new food-service unit with kitchen, dining rooms, storage facilities, lockers and equipment facilities.

Proposed unit V is essentially a guesthouse section with both double and single rooms, elevator service, cleaning service and maid service. University guests will be eligible to stay in the guest rooms. These include organization personnel, faculty, guest speakers, guest instructors, visiting orchestras, athletic teams, lecturers, alumni and groups brought to the campus for specific purposes.

Proposed unit VI will consist of conference rooms, meeting rooms and a ballroom also serving as a banquet and meeting room. While the units are separately described, they will all be a part of one building.

Compliance with the provisions of the statute has not been challenged.

Plaintiffs, The Iowa Hotel Association, Iowa Motor Court Association, Iowa Restaurant Association, other resident taxpayers and a student at the university, seek injunctive relief, urging that the law under which the regents are proceeding violates the Constitution of the state and that the proposed facilities are not authorized or within the power of the Board of Regents or the state of Iowa. Defendants ask for a declaration of constitutionality and legality of the proposed construction.

The trial court found that the provisions of chapter 185, Laws of the Fifty-eighth General Assembly, and the proposed construction and financing by the Board of Regents do not violate any constitutional or statutory provisions of the law. Plaintiffs have appealed.

This action is in equity and triable de novo in this court.

As propositions relied on for reversal, plaintiffs urge that the action of the Board of Regents in approving and authorizing the construction and the method of financing and the provisions of chapter 185 of the Laws of the Fifty-eighth General Assembly are unconstitutional, illegal and void in that they are repugnant to, and not in compliance with, the provisions of section 5 of Article VII of the Constitution; that the proposed method of financing would create a debt of the state of $4,500,000, plus debt service; is the exercise of illegal and unconstitutional powers of the Board of Regents; and that the plan of paying off the debt and service charge is not self-liquidating in that approximately 75% of the total debt is to be paid by student fees in the form of assessments against every student until the year 1992.

It is also urged that the law is an unconstitutional delegation of power and legislative authority to the Board of Regents and to the budget and financial control committee of the legislature. It is urged that the law purports to grant powers to the Board of Regents, an agency of the Executive Department, but requires that before the exercise of such powers can become effective they must be approved by the budget and financial control committee of the General Assembly, a part of the Legislative Department of Government, and that this offends the requirements of section 1 of Article III of the Constitution. This section establishes three separate departments of government and provides that no person charged with the exercise of powers properly belonging to one of these departments shall exercise any function appertaining to either of the others.

It is also urged that the state university is now engaged in competition with privately-operated hotels, motels, restaurants and eating establishments, and if the proposed project is completed, the university will enlarge and substantially extend said competition with private industry, in violation of the Bill of Rights (section 25, Article I) and of the purposes of the state government as outlined and stated in the Constitution.

■ ■ I. Plaintiffs in challenging the constitutionality of a legislative Act have the burden of establishing a right to relief. No presumption against constitutional validity can be

indulged. Every reasonable presumption must be called to support the Act. Plaintiffs must overcome these presumptions and negative every reasonable basis which may sustain the statute. Knorr v. Beardsley, 240 Iowa 828, 38 N.W.2d 236, and citations. Selzer v. Synhorst, 253 Iowa 936, 113 N.W.2d 724.

■ II. "As commonly and ordinarily understood, a debt includes every obligation by which one person is bound to pay money to another." Hubbell v. Herring, 216 Iowa 728, 735, 249 N.W. 430, 434. See also Buena Vista County v. Marathon Sav. Bank, 198 Iowa 692, 196 N.W. 729, 200 N.W. 199.

Plaintiffs first argue that the proposed financing would create a debt prohibited by the Constitution. The germane provisions of the Constitution are found in Article VII. Section 1 guards against the loaning of the credit of the state and the assumption of private debts. Section 2 limits state debts for casual deficits to $250,000. Sections 3 and 4 relate to losses to school funds and war debts. Section 5 provides: "Except the debts herein before specified in this article, no debt shall be hereafter contracted by, or on behalf of this State, unless such debt shall be authorized by some law for some single work or object, to be distinctly specified therein; and such law shall impose and provide for the collection of a direct annual tax, sufficient to pay the interest on such debt, as it falls due, and also to pay and discharge the principal of such debt, within twenty years from the time of the contracting thereof; but no such law shall take effect until at a general election it shall have been submitted to the people, and have received a majority of all the votes cast for and against it at such election; and all money raised by authority of such law, shall be applied only to the specific object therein stated, or to the payment of the debt created thereby; * * *."

■ If the proposed plan of financing creates a debt of the state, it contravenes the Constitution and must be enjoined. A debt can be incurred only as authorized. Hubbell v. Herring, supra. The provisions of the Constitution are mandatory and as binding on the legislative branch of the government as on the citizens. Taft Co. v. Alber, 185 Iowa 1069, 171 N.W. 719.

■ It should be kept in mind that the constitutional prohibition relates to debts "contracted by, or on behalf of this

State". In this case we are not concerned with what might be the authority of the Board of Regents in the absence of enabling legislation. The board in this case is acting within the scope of legislative authority and while so acting is limited thereby. The undertaking of the Board of Regents is not a debt for which the state is responsible because the enabling statute so provides. Section 6, chapter 185, Laws of the Fifty-eighth General Assembly, says: "No obligation created hereunder shall ever be or become a charge against the state of Iowa * * *." There is no appropriation under the law. There is no obligation, express or implied, by or in behalf of the state. The state does not promise to pay. There is no alternative procedure by which the state would be required to pay. The state, speaking through the legislature, says that no one may obligate the state to pay. When the enabling Act specifically negatives any charge against the state, there is no state debt within the meaning of the Constitution. For a comprehensive discussion and citation of authorities see Interstate Power Co. v. Town of McGregor, 230 Iowa 42, 296 N.W. 770, 146 A. L. R. 315.

The case of State ex rel. Fletcher v. Executive Council of State of Iowa, 207 Iowa 923, 223 N.W. 737, commonly called the $100,000,000 road bond case, is not controlling here. That case proceeded from the premise that the enabling procedure created a state debt. There being a state debt, the constitutional provisions relative to state debts were violated. Where, as here, there is no state debt, the constitutional prerequisites to the creation of a state debt are not controlling. Grout v. Kendall, 195 Iowa 467, 192 N.W. 529, involving World War I Soldiers' Bonus Act; Hubbell v. Herring, supra, involving the state sinking fund for public deposits; Knorr v. Beardsley, supra (a Soldiers' Bonus Act); and Faber v. Loveless, 249 Iowa 593, 88 N.W.2d 112 (the Korean Veterans' Bonus Law) all involved state debts and need no analysis here where no state debt is incurred.

III. The constitutionality of laws authorizing self-liquidating projects has long been settled. Plaintiffs do not challenge this proposition but insist that the proposed construction in the instant case is not self-liquidating. A project is self-liquidating if its cost is paid from revenues therefrom or

incident thereto. An agreement to make rates sufficiently high to raise the required revenue is not the contracting of a general debt or a financial obligation. Interstate Power Co. v. Town of McGregor, supra.

The State University of Iowa is the property of the state. It is primarily tax supported by appropriations by the legislature. The service rendered, however, in the many fields of activity is not free. Tuition and fees of various kinds are charged. The fact that a student may not participate or take advantage of every facility available does not mean that he is or should be relieved from paying student fees allocated to various projects. The present Memorial Union was a gift to the state for the use of the university. It is used as an integral part of the whole university function. Its value as a part of the university service is not challenged.

For the privilege of attending the university there is a charge for tuition. In addition, each student is assessed what is called a student fee. The student fee is collected for special and not general purposes. These include a season athletic ticket, subscription to the Daily Iowan and yearbook, hospitalization, concert and theater tickets, alumni magazine and class and organization dues. The funds so collected are allocated to the several purposes for which collected. For years there has been included a Union student fee. This is now $8.50 per student per semester and $4.00 per summer session. The funds so collected are paid to the Memorial Union Fund. This income has been estimated and projected to show that it will, during the period of the proposed indebtedness, retire 75% thereof. Earnings from the operation of the Union have been estimated to be sufficient to meet the remaining 25%. The receipts of the Memorial Union Fund from the various sources are from and incident to the Union building. The receipts being adequate to retire indebtedness, the project is self-liquidating.

IV. The delegation of administrative duties is not a delegation of legislative authority or responsibility. The authority of the Board of Regents to fix tuition rates is not questioned. The administration of the physical property of the university is as much the responsibility of the board and the university administration as the teaching of anatomy, physics,

literature or law. For the use and benefit of the facilities made available a charge may be made. If there ever was any doubt about this proposition, it has been answered by the statute. It is provided by the enabling Act "the board of regents shall have authority to charge and collect, from all students * * * at the university * * *, or from any specified class or part thereof for which such facilities are so deemed necessary, fees and charges * * *", and the fees and charges are to be applied to the costs.

 Numerous cases have arisen in other jurisdictions under various statutes. Individual analysis would extend this opinion unnecessarily. The weight of authority supports the conclusion that where the legislature authorizes the charging of student fees the Board of Regents acts legally in imposing the charge.

V. The last section of the enabling Act provides: "All such self-liquidating projects under this Act shall be first approved by the budget and financial control committee." The wording of the statute is so clear and free from ambiguity that the purpose of this safeguard is not apparent. We can only assume that it was to guard against any misunderstanding of the legislative intent and to place the stamp of compliance and legitimacy on projects within the scope of legislative intent. Because of this provision in the law, plaintiffs challenge the constitutionality of the entire Act.

The Board of Regents is an agency of the Executive Department of Government. Section 1, Article III, of the Constitution provides for three separate departments of government and says that no person charged with the exercise of powers belonging to one shall exercise any function appertaining to either of the others.

 Under this provision of the Constitution it is basic that there may be no legislative interference in the performance of an executive function. Plaintiffs argue that the provision of the enabling Act requiring approval by the budget and financial control committee is such an unconstitutional invasion of executive functions as to render the entire Act void.

We quote excerpts from 16 C. J. S., Constitutional Law, section 76: "* * * It is a firmly established principle of law that the constitutionality of a statute or ordinance may not be

attacked by one whose rights are not * * * adversely affected by the operation of the statute. * * * One of the many variations of this rule is the principle that one may not urge the unconstitutionality of a statute who is not harmfully affected by the particular feature of the statute alleged to be in conflict with the constitution.

"* * * he must show that the alleged unconstitutional feature of the statute injures him * * *."

Plaintiffs do not argue that they have standing to urge this point. No authority is cited.

A majority of the court is of the opinion that plaintiffs have made no showing sufficient to raise a constitutional question on this point.

In Eysink v. Board of Supervisors of Jasper County, 229 Iowa 1240, 1246, 296 N.W. 376, 379, we said: "* * * a constitutional question should not be considered except when necessarily involved and then only after the fullest argument and investigation * * *." See also New York Life Insurance Co. v. Burbank, 209 Iowa 199, 216 N.W. 742, and Knauss v. Aleck, 202 Iowa 91, 209 N.W. 444.

VI. Plaintiffs contend that the university is now engaged in competition with privately operated hotels, motels, restaurants and eating establishments and will increase that competition. Plaintiffs urge that this is an unconstitutional invasion of private enterprise by an agency of the state. No specific provision of the Constitution is cited except Article I, section 25. This section provides: "This enumeration of rights shall not be construed to impair or deny others, retained by the people."

Plaintiffs' Exhibits B-17, B-18 and B-19 show a resolution passed at a meeting of the State Board of Regents on May 13, 1960. From this resolution certain findings and observations are pertinent, including the following:

(1) The need for a kitchen-dining unit to replace an obsolete, inadequate, inefficient and poorly-located food unit.

(2) A guesthouse to accommodate, on a limited basis, those guests of the university who are on the campus in connection with some aspect of the university's teaching, research and service activities.

(3) An activities unit to facilitate meetings of student organizations, educational meetings, seminars, conferences, short courses, continuation study, institutes, postgraduate clinics and workshops.

It was noted that there are 168 recognized and formal student organizations on the campus meeting weekly or semiweekly, all of which could benefit from added Union facilities; that the student union board had 10 years previously requested an increase in the student fee for capital purposes in enlarging the Memorial Union and that this action was reaffirmed by the student union board in 1959; that in the years 1958 and 1959 there was an attendance of nearly 13,000 persons at 182 short courses or clinics sponsored by or connected with a department or unit of the university; and that the City-University Committee of Iowa City, a joint committee representative of business, industry, government and education in the city, had given its unqualified endorsement to the three-unit addition.

The evidence and the exhibits show, without question, that there is a need at the university for the proposed additional facilities and that the service rendered to the people of the state as a whole by the university will be enhanced thereby.

The value of a student union is not challenged. We quote from plaintiffs' argument:

"Again we say that we fully recognize the value of the present Iowa Memorial Union with the facilities included therein as a proper part of the educational program of the University.

"* * * we agree that a proper Student Union is desirable and essential, * * *."

What plaintiffs object to is the expansion of facilities and the addition of 110 guest rooms to the union structure.

Assuming arguendo that the operation of a hotel or restaurant is not a proper function for the state or a state agency, it does not follow that facilities for food and lodging are improper when incident to the main purpose and complete program of the university. The record supports the conclusion of Dr. Virgil M. Hancher, president of the university, that student unions which include facilities such as proposed are "properly a part of an educational institution such as the University of Iowa."

A modern university is not just a number of classrooms where students may learn all they need to know from professors. It must be an inspiration to greater knowledge. It must, through research, explore the unknown. It must learn what others are doing. It must contribute to the general welfare. It must disseminate knowledge beyond the student body through the Extension Division and the Department of Continuing Education. For these purposes it must invite individuals and groups to the campus. Food, housing and entertainment are necessary incidents.

Much of the record and argument was devoted to showing groups that have met and might meet at Iowa City. With few exceptions these are groups directly interested in what can be learned through contact with the university and the Department of Continuing Education. Through the union the university now has some food service for such groups. The university also has some guest housing (64 beds) in an apartment building built for married students. The arrangement is neither convenient nor efficient. The food departments at the union are not arranged for efficiency. The record as a whole leads to the conclusion that the proposed improvement is in the interest of efficiency in rendering an incidental but necessary service properly a part of the university's function.

Without invitation some persons at times eat at the university food facilities. University hospital outpatients and persons visiting hospital patients are allowed the use of the cafeteria at the Quadrangle, one of the men's housing units. This is at the request of the hospital administration, prompted by the lack of any other convenient facility. There is no screening of those who are connected with the university from others but the percentage of those who use the university facilities without invitation is small. Outside patronage is not encouraged and is contrary to the policy of the Board of Regents and the university. The policy of the board is expressed in the formal resolution as follows:

"No service shall be established or conducted solely for the purpose of profiting from the public sale of services or products. In those instances in which sales of services or products are made to the general public, that service shall be secondary and

incidental to the primary functions of the institutions, and the institution shall not seek to advertise or promote for the purpose of increasing the volume of general public business."

The substance of the testimony of plaintiffs' witnesses, other than those connected with the university, was that the proposed additions to the Memorial Union might hurt their business. The fact that additional or improved facilities may reduce the demand for others is obvious but the extent to which private business might be impaired is pure speculation. No overwhelming threat to private enterprise is apparent from the record. If the present food service arrangement is inefficient and inadequate, the specter of competition should not quarantine the university into inefficiency and stagnation. If it is necessary and proper for the university to provide housing for students, it is difficult to conclude that providing housing for guests of the university is an unconstitutional invasion of the rights of the people. Incidental competition is not a basis for an injunction against a state agency engaged in the performance of a constitutional and statutory function.

Cases from other jurisdictions where business activity by a state was barred are not factually comparable to the situation here. Rippe v. Becker, 56 Minn. 100, 57 N.W. 331, 22 L. R. A. 857, involved the construction and operation of a grain elevator and under different constitutional provisions. White Eagle Oil & Refining Co. v. Gunderson, 48 S. D. 608, 205 N.W. 614, 43 A. L. R. 397, involved a statute permitting the state to sell gasoline to control prices. Authorities permitting school lunches appear in 63 A. L. R. 92 and an annotation on page 100.

We conclude, as did the trial court, that there is no clear, plain and palpable violation of the Constitution in the enabling Act, chapter 185, Laws of the Fifty-eighth General Assembly. The proposed construction and the acts of the Board of Regents and the university administration are constitutional and legal.

The case is affirmed.—Affirmed.

All JUSTICES concur except LARSON, J., who takes no part.